UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DENNIS T. HUTTO,

            Plaintiff,

v.                                    Case No. 3:17-cv-461-J-39MCR

FERNANDINA BEACH POLICE
DEPARTMENT, et al.,

            Defendants.
_____

## ORDER

### I. Status

Plaintiff Dennis Hutto is proceeding in this action on a pro se Amended Civil Rights Complaint (Doc. 19; Complaint) with exhibits (Docs. 19-1 through 19-19).[1] Plaintiff "alleges an unconstitutional arrest, search and seizure, and the unconstitutional denial of [his] right to due process." Complaint at 1. His claims stem from his arrest and the seizure of his truck on December 23, 2014, in connection with a reported hit-and-run accident. Id. at 3-4. After the dismissal of Defendant Chief James Hurley (Doc. 47), the remaining Defendants are the City of Fernandina Beach (the City) and four officers of the Fernandina Beach Police Department (FBPD): Sgt. Hepler, Detective William B.

---

[1] The Court will refer to the Complaint exhibits as "Compl. Ex." followed by the corresponding letter, "A" through "R," (e.g., "Compl. Ex. A") and the page number.

Evatt, Officer M. Douglass, and Officer Richie Benton (collectively, "the Officers").

Before the Court are three motions filed by Plaintiff: Plaintiff's Motion to Compel Response to Non-Party Subpoena (Doc. 61; Motion to Compel), Plaintiff's Motion for Extension of Time (Doc. 63; Extension Motion), and Plaintiff's Request for Judicial Notice (Doc. 64; Judicial Notice Motion) (collectively, "Plaintiff's Motions"). Also before the Court are Defendants' motions for summary judgment (collectively, "Defense Motions").

## II. Plaintiff's Motions

In his Motion to Compel, Plaintiff seeks an order compelling Sherry Daniel of Daniel Bail Bonds to respond to a subpoena (Doc. 61-2; Subpoena). See Motion to Compel at 1. Plaintiff states the "subpoena was served in 'good faith.'" See id. at 2. However, Plaintiff has not shown proof of service as required under Rule 45(b). For instance, Plaintiff does not show the "date and manner of service," and he does not provide evidence that a person "who is at least 18 years old and not a party" delivered the subpoena to the recipient. See Fed. R. Civ. P. 45(b)(1), (4). In fact, the "Proof of Service" portion of the Subpoena is blank. See Subpoena at 3. Accordingly, Plaintiff's Motion to Compel is due to be denied.

In his Extension Motion, Plaintiff asks for an extension of time before the Court rules on the Defense Motions to afford him

an opportunity to supplement the Nassau County criminal docket in case number 2014-CF-890 ("Nassau County Case").[2] See Extension Motion at 1-2. A review of the Nassau County docket shows the transcripts have been added.[3] Thus, Plaintiff's Extension Motion is due to be denied as moot.

Finally, in his Judicial Notice Motion, Plaintiff asks the Court to take judicial notice of transcripts of proceedings in the Nassau County Case. See Judicial Notice Motion at 1-2. Defendants do not object to the Court taking judicial notice of the transcripts filed in the Nassau County Case. Accordingly, Plaintiff's Judicial Notice Motion is due to be granted, and the Court takes judicial notice of the following transcripts filed in the Nassau County Case: (1) the deposition transcript of Defendant Benton (Doc. 64-1; Benton Depo.); (2) the transcript of a hearing on a motion to suppress, held on April 21, 2016 (Doc. 64-2; Suppression Hr'g Tr.); (3) the transcript of a hearing on a motion to dismiss, held on August 18, 2016 (Doc. 64-3; Dismissal Hr'g

---

[2] To demonstrate the Officers violated his constitutional rights, Plaintiff relies in part on transcripts of proceedings in the criminal case against him. See Extension Motion at 1-2.

[3] See Nassau County Case docket, available at https://www.civitekflorida.com/ocrs/app/caseinformation.xhtml?query=pEDPP2uzq_TzhhXpXrg-gK6ME1KX2-ns-Nh89Phpq8Y&from=caseSearchTab(last visited March 4, 2019).

Tr.); and (4) the deposition transcript of a witness, Brandi Nelms (Doc. 64-4; Nelms Depo.).

### III. Defense Motions

Defendants have filed separate motions for summary judgment: (1) the City's Motion for Summary Judgment (Doc. 54; City Motion); (2) Evatt's Motion for Summary Judgment (Doc. 55; Evatt Motion); (3) Benton's Motion for Summary Judgment (Doc. 56; Benton Motion); (4) Douglass' Motion for Summary Judgment (Doc. 57; Douglass Motion); and (5) Hepler's Motion for Summary Judgment (Doc. 58; Hepler Motion).

The Court previously advised Plaintiff of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)) and notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case, which may foreclose subsequent litigation on the matter. See Summary Judgment Notice (Doc. 59). Plaintiff responded to each of the Defense Motions as follows: (1) Response in Opposition to the City Motion (Doc. 65; Response to City Motion); (2) Response in Opposition to the Evatt Motion (Doc. 66; Response to Evatt Motion); (3) Response in Opposition to the Benton Motion (Doc. 67; Response to Benton Motion); (4) Response in Opposition to the Douglass Motion (Doc. 68; Response to Douglass Motion); and (5) Response in Opposition to the Hepler Motion (Doc. 69; Response to Hepler

Motion) (collectively, "Responses").[4] With leave of Court, Defendants filed replies to Plaintiff's Responses (Docs. 74, 75). The Defense Motions are ripe for this Court's review.

## IV. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004)

---

[4] Defendants and Plaintiff support their filings with exhibits. For sake of clarity, the Court will introduce the exhibits and document numbers when relevant to the Court's discussion and analysis. Page numbers reflect the pagination assigned by the Court's CM/ECF docketing system, which are found at the top of each page.

(citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## V. Facts

Plaintiff alleges Defendants Hepler, Douglass, and Benton

6

arrested him and seized his blue Ford F150 on December 23, 2014, following the report of a hit-and-run accident in Fernandina Beach. Complaint at 4.[5] Defendant Benton, in his affidavit,[6] avers he reported to the scene of the accident, a Publix supermarket parking lot. See Benton Affidavit ¶ 3. Defendant Benton interviewed a Publix employee, Cody Evans, who reported the accident. Mr. Evans reported he observed a "green F150 truck" hit two cars while attempting to pull out of a parking space. Id. ¶ 4. Mr. Evans also told Defendant Benton he had been "struck" by the truck and sustained minor injuries. See Benton Depo. at 7; Suppression Hr'g Tr. at 22. While observing the truck driver's attempts to pull out of the parking space, Mr. Evans took a photo[7] of the rear of the truck, which he provided to Defendant Benton. See Benton Affidavit ¶ 5. The photo captured the rear license plate, see Truck Photo at 1, and Defendant Benton relayed the license plate number "to dispatch." Benton Affidavit ¶ 5.

Based on the license plate number, FBPD officers identified the truck's owner as Plaintiff. Defendants Hepler and Douglass

---

[5] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

[6] See (Docs. 54-7, 56-1, 57-2, 58-2; Benton Affidavit).

[7] See (Docs. 54-4, 56-2, 57-3, 58-3; Truck Photo).

aver in their affidavits[8] that they traveled separately to Plaintiff's residence to investigate. <u>See</u> Hepler Affidavit ¶ 4; Douglass Affidavit ¶ 4. Upon their arrival to Plaintiff's residence, both Defendants Hepler and Douglass touched the hood of the truck, and they "noted it to be warm," which they concluded suggested the truck had been driven recently. <u>See</u> Hepler Affidavit ¶ 5; Douglass Affidavit ¶ 7. Defendants Hepler and Douglass explained to Plaintiff the basis for the investigation and asked Plaintiff to step outside the residence, which Plaintiff did. <u>See</u> Hepler Affidavit ¶ 7; Douglass Affidavit ¶ 5.

In his affidavit[9] and in his testimony at the Dismissal Hearing, Plaintiff acknowledges he informed the officers the truck parked in his driveway belonged to him. <u>See</u> Plaintiff Affidavit at 3; Dismissal Hr'g Tr. at 7. However, he stresses, his truck is <u>blue</u>, not green. Plaintiff Affidavit at 1-2. Plaintiff and his neighbor, Brandi Nelms, informed Defendants Hepler and Douglass Plaintiff's truck had not left the driveway all day and Plaintiff could not have driven the truck because he did not have the keys. <u>Id.</u> at 3.

At her deposition, Ms. Nelms testified under oath she lived in the trailer directly next to Plaintiff's, and she claimed to have been home all day on December 23, 2014, watching movies. <u>See</u>

---

[8] <u>See</u> (Docs. 54-5, 56-3, 57-4, 58-1; Hepler Affidavit, Docs. 54-6, 56-4, 57-1, 58-4; Douglass Affidavit).

[9] (Docs. 65-2, 66-2, 67-2, 68-2, 69-2; Plaintiff Affidavit).

Nelms Depo. at 6, 7, 14. She recalled seeing officers arrive and said one of them questioned her about the truck. Ms. Nelms testified the officer asked her if she saw the truck leave the yard that day, and she responded, "no, sir, I haven't. And—well, you know, anything's possible but I know that I never saw it not in the driveway, I never seen it leave, I never heard it crank up, and I could always hear it crank in the house because it's right there." Id. at 14. She further testified she knew Plaintiff did not have the keys to his truck in his possession on the day he was arrested. Id. at 21.[10] Ms. Nelms described the color of the truck as blue with some gray. Id.

While still at Publix, Defendant Benton learned the owner of the truck had been located. He then drove Mr. Evans to Plaintiff's residence, and Mr. Evans positively identified Plaintiff as the driver of the truck involved in the hit-and-run accident. See Benton Affidavit ¶¶ 3, 6; Hepler Affidavit ¶ 7; Douglass Affidavit ¶ 6. In his deposition in the Nassau County Case, Defendant Benton testified that when he arrived at Plaintiff's residence, he recognized the truck, with "that same tag number" shown in the picture "backed into the driveway." Benton Depo. at 12.

According to the arrest and booking report, Plaintiff was

---

[10] Ms. Nelms did not testify to informing Defendants Helper and Douglass, on the day of the arrest, she knew Plaintiff did not have the keys. However, as the non-moving party, Plaintiff is entitled to have all reasonable inferences and factual disputes construed in his favor. See Haves, 52 F.3d at 921. Defendant Hepler acknowledges Plaintiff denied having possession of the keys. See Hepler Affidavit ¶ 6.

arrested after Mr. Evans positively identified him, and his truck was seized because "a search of [his] driver's license status revealed that [it was] suspended and he [was] considered a Habitual Traffic Violator." See Compl. Ex. A at 3. The impound report notes minor physical damage to the truck, including scuff marks and a dent in the front fender on the driver's side, and indicates the truck's color is "green." Id. at 4. Plaintiff was charged with misdemeanor and felony hit-and-run, driving on a suspended license as a habitual traffic offender, and reckless driving. Id. at 2. The charges against Plaintiff were dismissed on October 27, 2016. See Complaint at 7. However, Plaintiff's truck was never returned to him. Id. at 8.

After Plaintiff's arrest, on January 6, 2015, he received a letter from Defendant Evatt informing him the FBPD initiated forfeiture proceedings against his truck under the Florida Contraband Forfeiture Act (FCFA), Florida Statutes section 932.703(2)(a). Id. at 4. Plaintiff sent numerous letters to both Defendant Evatt and the Nassau County courts to pursue his rights under the FCFA. Id. at 5. Plaintiff discovered in February 2015 that no forfeiture case had been opened involving his truck, and on March 6, 2015, Defendant Evatt hand-delivered to Plaintiff an undated letter "informing [Plaintiff] that FBPD was no longer seeking to seize his truck and that . . . his truck had been released to a towing company back on January 22, 2015." Id. at 5, 6. Plaintiff testified at a dismissal hearing in the Nassau County

Case that he was unable to locate his truck after its release to the towing company. See Dismissal Hr'g Tr. at 19. Defendant Evatt similarly has no knowledge of "what happened to the truck after it left the custody of the FBPD." See Evatt Affidavit ¶ 14.

## VI. Plaintiff's Claims for Relief

Plaintiff asserts Defendants' actions resulted in the loss of "his truck, two homes, with all their contents, and his quality of life." Complaint at 8. As relief, Plaintiff seeks the cost of litigation, declaratory relief, and compensatory damages. Id. at 10-11.

Plaintiff's claims against Defendants Hepler, Douglass, and Benton ("the Investigating Officers") are based on their involvement in the investigation of the hit-and-run accident. Plaintiff states the Investigating Officers unlawfully and without probable cause arrested him in violation of the Fourth Amendment. Id. at 8. Further, he claims the Investigating Officers violated his due process rights under the Sixth and Fourteenth Amendments by "willfully suppressing and omitting the exculpatory testimony of [a witness]." Id. Plaintiff asserts Defendant Evatt, as the property officer for FBPD, violated his "Sixth and Fourteenth Amendment rights to access to favorable evidence and due process" when Defendant Evatt disposed of his truck. Id. at 9.

Finally, Plaintiff asserts the City violated his rights under the Fourth and Fourteenth Amendments for two reasons. First, Plaintiff alleges he was arrested under the authority of a mutual

aid agreement (MAA) between the FBPD and Nassau County Sheriff's Office (NCSO), which he contends the police departments did "not have legislative authority to enter into." Id. He also suggests his arrest under the MAA was "contrary to Florida law" because the FBPD officers, who arrested him outside their jurisdiction, did not "request[] assistance from NCSO." Id. at 7, 9. Second, Plaintiff asserts the FBPD has a "policy . . . to seize personal property under the guise of [the FCFA] and sell the seized property back to it's [sic] owner." Id. at 7.[11]

## VII. Defense Arguments

The Officers assert they are entitled to qualified immunity because they were acting within their discretionary authority as officers of the FBPD, and Plaintiff fails to demonstrate a constitutional violation. See Douglass Motion at 5-6; Hepler Motion at 3, 5-6; Benton Motion at 3, 5-6; Evatt Motion at 3, 5-6. While Defendant Benton denies having participated in Plaintiff's arrest or the seizure of his truck, the Investigating Officers contend they had probable cause for both the arrest and the seizure. See Douglass Motion at 9-11; Hepler Motion at 9-11; Benton Motion at 9-11.

---

[11] In the first paragraph of his Complaint, where he describes the nature of the case, Plaintiff states Defendants' conduct also violated his rights under the Florida Constitution. See Complaint at 1. However, Plaintiff does not state such a claim against any Defendant. See id. at 8-9. And, in his responses, Plaintiff clarifies he alleges claims under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution. See Responses at 1. Thus, the Court will limit its ruling accordingly.

The City seeks judgment in its favor because Plaintiff "has failed to meet the requirement that a § 1983 Plaintiff show the existence of an illegal municipal policy before recovering against a municipality." City Motion at 3. Moreover, the City asserts Plaintiff fails to demonstrate the Officers violated his constitutional rights when they arrested him and seized his truck. Id. at 12. Importantly, the City concedes "that both Plaintiff and his truck were 'seized' within the meaning of the Fourth Amendment." Id. at 13.

### VIII. Claims Against the Officers: Qualified Immunity

An officer sued in his individual capacity "is entitled to qualified immunity for his discretionary actions unless he violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)). The defendant bears the initial burden to demonstrate he was acting in his discretionary authority at the relevant times. Dukes v. Deaton, 852 F.3d 1035, 1041-42 (11th Cir.), cert. denied, 138 S. Ct. 72 (2017). Plaintiff contends the Officers have not satisfied their burden to demonstrate they were acting in their discretionary authority, stating "there is nothing discretionary about the defendants' conduct," which he characterizes as suppressing material evidence. See Responses at 9.

The evidence demonstrates the Officers were engaged in discretionary functions during the events in question. Each individual Defendant avers in his affidavit he was employed by the FBPD and acting in the scope of that role at all relevant times. See Evatt Affidavit (multiple paragraphs); Hepler Affidavit ¶¶ 2, 3; Douglass Affidavit ¶¶ 2, 3; Benton Affidavit ¶¶ 2, 3. Plaintiff provides no evidence to rebut the Officers' assertions that they were acting within their discretionary authority at the relevant times. In fact, in support of his allegations, Plaintiff relies upon the arrest and booking report, which Defendants Hepler and Douglass signed and in which Defendant Benton is mentioned as the responding officer. See Compl. Ex. A at 3. And, with respect to his claims against Defendant Evatt, Plaintiff relies in part upon a letter Defendant Evatt sent to him, as "Officer/Detective" with the FBPD. See Compl. Ex. B at 2. Thus, the Officers have carried their burden to demonstrate they were acting in their discretionary authority at all relevant times.

Once a court is satisfied the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate the defendant is not entitled to qualified immunity. Coley v. Smith, 441 F. App'x 627, 628 (11th Cir. 2011) (citing Bryant v. Jones, 575 F.3d 1281, 1294 (11th Cir. 2009)). To overcome the qualified-immunity defense, a plaintiff bears the burden to demonstrate two elements: the defendant's conduct caused plaintiff to suffer a constitutional violation, and the constitutional

violation was "clearly established." Id. See also Davila v. Gladden, 777 F.3d 1198, 1210-11 (11th Cir. 2015). Courts may exercise discretion to "conduct the qualified immunity analysis" in either order. Id. at 1211. Exercising its discretion, the Court finds the qualified immunity analysis begins and ends with the first element because Plaintiff has not demonstrated the Officers' actions or inactions resulted in a constitutional violation under either the Fourth, Sixth, or Fourteenth Amendments.

### A. Fourth Amendment

Plaintiff asserts the Investigating Officers lacked probable cause to arrest him. See Complaint at 8. Plaintiff argues the Investigating Officers lacked probable cause because they knew he did not have the keys, Ms. Nelms told them she did not see the truck leave, there was a factual discrepancy in the color of the truck as reported by Mr. Evans (green) and the actual color of the truck (blue), the truck had only minor physical damage, the hood of the truck was warm from sitting in the sun, and the eyewitness identification was "highly suggestive." See Responses at 7-9; Plaintiff Affidavit at 3.

The parties agree Defendant Benton did not participate in Plaintiff's arrest. Defendant Benton's involvement was limited to investigating the accident at Publix, driving Mr. Evans to Plaintiff's residence to identify Plaintiff, and returning Mr. Evans to Publix. See Benton Affidavit ¶¶ 4, 6, 8. Plaintiff does not dispute Defendant Benton did not participate in his arrest

other than to conduct the eyewitness investigation. See Response to Benton Motion at 2-3. To the extent Defendant Benton did not participate in Plaintiff's arrest, he cannot be said to have violated Plaintiff's Fourth Amendment rights. However, because Plaintiff sues Defendant Benton for his involvement in the investigation that resulted in his arrest and seizure of his truck, see Complaint at 8, the analysis that follows will apply to him as well, as one of the Investigating Officers.

Under the Fourth Amendment, a warrantless arrest is unreasonable unless the arresting officer had probable cause. See Gates v. Khokhar, 884 F.3d 1290, 1297 (11th Cir. 2018), cert. denied, No. 18-511, 2019 WL 113142 (U.S. Jan. 7, 2019). An officer has probable cause to effectuate an arrest if the "facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Id. at 1298 (quoting Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010)).

Establishing probable cause "is not a high bar." Paez v. Mulvey, --- F.3d ---, No. 16-16863, 2019 WL 489048, at *6 (11th Cir. Feb. 8, 2019) (quoting D.C. v. Wesby, 138 S.Ct. 577, 586 (2018)).

> To determine whether an officer had probable cause for an arrest, "[courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively

16

> reasonable police officer, amount to' probable cause."
> Because probable cause "deals with probabilities and
> depends on the totality of the circumstances," it is "a
> fluid concept" that is "not readily, or even usefully,
> reduced to a neat set of legal rules[.]" It "requires
> only a probability or substantial chance of criminal
> activity, not an actual showing of such activity."

Wesby, 138 S. Ct. at 586 (internal citations omitted). Moreover,

"[a]lthough probable cause requires more than suspicion, it does

not require convincing proof, and need not reach the [same]

standard of conclusiveness and probability as the facts necessary

to support a conviction." Wood v. Kesler, 323 F.3d 872, 878 (11th

Cir. 2003) (citing Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir.

2002) (internal quotation marks and citations omitted) (alteration

in original)), cert. denied, 540 U.S. 879 (2003).

An arrest supported by probable cause is an "absolute bar to

a subsequent constitutional challenge to the arrest," Gates, 884

F.3d at 1297, regardless of whether a conviction follows, see

Knight v. Jacobson, 300 F.3d 1272, 1275 (11th Cir. 2002) (citing

Baker v. McCollan, 443 U.S. 137, 145 (1979)). See also Marx v.

Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990) ("That a defendant

is subsequently acquitted or charges are dropped against the

defendant is of no consequence in determining the validity of the

arrest itself.").

When an officer asserts a qualified-immunity defense, the

"arguable probable cause" standard, not the higher standard of

probable cause, governs the analysis. Knight, 300 F.3d at 1274. An

officer had arguable probable cause, and is thus entitled to qualified immunity, when a reasonable officer "in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Carter v. Butts Cty., Ga., 821 F.3d 1310, 1320 (11th Cir. 2016) (emphasis added). In assessing whether an officer had arguable probable cause to arrest, courts "apply [an] objective reasonableness standard to the facts as they relate to the elements of the alleged crime for which the plaintiff was arrested." Id.

Plaintiff was charged with the following offenses under Florida Statutes: (1) hit-and-run (misdemeanor); (2) driving while license suspended or revoked (DWLSR) (habitual offender); (3) reckless driving (misdemeanor); and (4) hit-and-run (felony). See Compl. Ex. A at 2. Each offense requires the accused to have been driving a vehicle under certain circumstances. The misdemeanor hit-and-run statutory provision provides the following:

> The driver of any vehicle involved in a crash resulting only in damage to a vehicle or other property which is driven or attended by any person shall immediately stop such vehicle at the scene of such crash or as close thereto as possible, and shall forthwith return to, and in every event shall remain at, the scene of the crash until he or she has fulfilled the requirements of s. 316.062. A person who violates this subsection commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

Fla. Stat. § 316.061(1). The felony hit-and-run statutory provision requires injury to a person:

> The driver of a vehicle involved in a crash occurring on
> public or private property which results in injury to a
> person other than serious bodily injury shall
> immediately stop the vehicle at the scene of the crash,
> or as close thereto as possible, and shall remain at the
> scene of the crash until he or she has fulfilled the
> requirements of s. 316.062. A person who willfully
> violates this paragraph commits a felony of the third
> degree, punishable as provided in s. 775.082, s.
> 775.083, or s. 775.084.

Fla. Stat. § 316.027(2)(a). The DWLSR (habitual offender) statute

provides the following:

> Any person whose driver license has been revoked
> pursuant to s. 322.264 (habitual offender) and who
> drives any motor vehicle upon the highways of this state
> while such license is revoked is guilty of a felony of
> the third degree, punishable as provided in s. 775.082,
> s. 775.083, or s. 775.084.

Fla. Stat. § 322.34(5). Finally, the reckless driving statute

provides, "[a]ny person who drives any vehicle in willful or wanton

disregard for the safety of persons or property is guilty of

reckless driving." Fla. Stat. § 316.192(1)(a) Causing damage to

property or a person is a misdemeanor of the first degree. Id. §

316.192(3).

Under the totality of the circumstances, the facts within the

collective knowledge of the Investigating Officers gave them at

least arguable probable cause, if not actual probable cause, to

arrest Plaintiff for his suspected involvement in a hit-and-run

accident, for reckless driving, or for DWLSR. Mr. Evans, the

eyewitness and victim, reported a hit-and-run accident, described

the vehicle as a "green F150 truck," and provided a picture of the

19

truck to Defendant Benton. See Benton Affidavit ¶¶ 4, 5. The Investigating Officers, finding a Ford F150 truck with the license plate number matching the one in the photo, had no reason to question whether the truck in Plaintiff's driveway was the one Mr. Evans saw involved in an accident. Further, Plaintiff told Defendants Hepler and Douglass the truck parked outside his house, with the license plate matching the one in the picture, belonged to him. See Plaintiff Affidavit at 1-2. See also Compl. Ex. A at 4. Given the weight reasonably attributable to these facts, whether the truck was blue or green was not material to a probable cause analysis at that point; the Investigating Officers located the truck shown in the picture, and Plaintiff confirmed the truck belonged to him.[12]

Defendants Hepler and Douglass also reasonably concluded the truck had recently been driven and had been involved in an accident, because the hood was warm to the touch and the truck had some minor physical damage (scuff marks and a dent). See Hepler Affidavit ¶ 5; Compl. Ex. A at 4. Plaintiff himself acknowledges the truck had "various scuffs and scratches." See Dismissal Hr'g Tr. at 18. Not only did the Investigating Officers quickly locate

---

[12] The picture of the truck clearly depicts the rear license plate and the model/make. See Truck Photo at 1. Upon review of the picture, the color of the truck could fairly be described as some shade of blue or green, depending on the light and other factors. Id. Plaintiff himself even described the truck as a "2000 green/teal Ford F150 truck" in pleadings he filed in the Nassau County Case. See Compl. Ex. L at 3. See also Compl. Ex. F at 2 (describing the truck as "green").

the truck in the picture, along with its self-proclaimed owner, but shortly after the accident, Mr. Evans visually identified Plaintiff as the driver involved in the hit-and-run accident.[13] <u>See</u> Hepler Affidavit ¶ 7; Douglass Affidavit ¶ 6; Benton Affidavit ¶ 6.

The facts within the common knowledge of the Investigating Officers also demonstrated the accident resulted in physical injuries to a person and damage to property, as required to charge a driver with felony and misdemeanor hit-and-run and reckless driving. <u>See</u> Fla. Stat. §§ 316.027(2)(a); 316.061(1); 316.192(3). The police report notes, "Mr. Evans complained of back pain and believed his back had been injured due to the crash." Compl. Ex. A at 3. <u>See also</u> Suppression Hr'g Tr. at 15 (Defendant Benton testifying Mr. Evans complained of back pain). Moreover, Defendant Benton testified he estimated about $1,500 worth of damage to one of the cars Plaintiff allegedly hit, while the other car had "very minor damage." Benton Depo. at 13, 14. <u>See also</u> Suppression Hr'g Tr. at 14-15.

Plaintiff argues the damage to his truck was too minor to have caused significant damage to at least one other vehicle. <u>See</u> Responses at 8. Whether scuff marks and a dent were the result of

---

[13] Plaintiff does not assert anyone else was home when he was arrested. However, Ms. Nelms states in her deposition that Plaintiff's mom was present when Plaintiff was being questioned by the officers. <u>See</u> Nelms Depo. at 18. Ms. Nelms also said she saw Plaintiff's roommate at the house earlier that day, but she did not mention whether the roommate was there when Plaintiff was arrested. <u>See</u> <u>id.</u> at 10.

the hit-and-run or were inconsistent with the type of impacts Mr. Evans reported goes to Plaintiff's guilt or innocence, not to whether the Investigating Officers had arguable probable cause to arrest him at the time. The same can be said about the reason for the truck's hood being warm. While the truck's hood could have been warm because it was a sunny day in Florida, Defendants Hepler's and Douglass's conclusions were reasonable in the context of all other facts and circumstances.[14] Importantly, a finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Wesby, 138 S. Ct. 586. See also Von Stein v. Brescher, 904 F.2d 572, 578 n.9 (11th Cir. 1990) ("'Probable cause' defines a radically different standard than 'beyond a reasonable doubt,' and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction.").

That the Investigating Officers did not find keys, even assuming they searched for them, and were told by a neighbor she did not see the truck leave all day, does not discount that a reasonable officer, faced with the same set of facts and circumstances, "could have believed probable cause existed" to

---

[14] Defendants Hepler's and Douglass's conclusions as to why the hood was warm are even more reasonable considering the temperature. The Farmer's Almanac records the maximum temperature in Fernandina Beach on December 23, 2014, as 70.2 degrees. See https://www.farmersalmanac.com/weather-history/search-results/ (last visited March 1, 2019).

arrest Plaintiff. <u>Gates</u>, 884 F.3d at 1301 (emphasis added). The undeniable fact the Investigating Officers faced on December 23, 2014, was that the truck sitting in Plaintiff's driveway, which Plaintiff admitted to owning, was the same truck Mr. Evans photographed at Publix only a short time before. Given the circumstances, Defendants Hepler and Douglass reasonably could have concluded Plaintiff either did not know what he had done with the keys[15] or was lying to protect himself.

Similarly, given the facts, Defendants Hepler and Douglass reasonably could have concluded Ms. Nelms's statements were unreliable or untruthful, especially considering her statements appeared to be contradicted by photographic evidence. <u>See</u> <u>Paez</u>, 2019 WL 489048, at *6 ("[A]rresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed.") (quoting <u>Dahl v. Holley</u>, 312 F.3d 1228, 1234 (11th Cir. 2002)). Plaintiff himself avers Defendants Hepler and Douglass told him, when they arrested him, they did not believe Ms. Nelms. <u>See</u> Plaintiff Affidavit at 3. Even more, in her

---

[15] Defendant Hepler testified Plaintiff claimed to have been drinking. There is no evidence to suggest Plaintiff had been drinking on the day of his arrest. However, Defendant Hepler's belief that Plaintiff had been drinking conceivably could have led Defendant Hepler to discount Plaintiff's statements about his inability to drive the truck as less than reliable.

deposition, Ms. Nelms testified she informed Defendants Hepler and Douglass she did not see the truck leave or hear it start, but she also said "anything's possible" and told them she had been watching movies. <u>See</u> Nelms Depo. at 14. It is within the realm of human experience to conclude that a person watching a movie may not have an awareness of things happening outside.

In analyzing whether officers had arguable probable cause, the Supreme Court cautions against requiring officers, in the midst of a criminal investigation, to accept without question innocent explanations for suspicious actions or facts. <u>See</u> <u>Wesby</u>, 138 S. Ct. at 587, 588 (holding the officers reasonably could have concluded the innocent explanation partygoers provided for being in an uninhabited house was untrue, based on all surrounding circumstances, including the partygoers' suspicious behavior). Under the circumstances, it was reasonable for the officers to conclude Plaintiff's and Ms. Nelms's statements were untruthful or unreliable.

Choosing to discount Plaintiff's and Ms. Nelms's statements that appeared obviously contradicted by physical evidence (the photo), is far different from ignoring objective, indisputable proof a suspect had not committed a crime. <u>Cf.</u> <u>Carter v. Butts Cty., Ga.</u>, 821 F.3d 1310, 1321 (11th Cir. 2016) (holding an officer lacked even arguable probable cause to arrest the plaintiffs for trespass because the officer knew the house had been foreclosed

on, and the officer ignored documentation that unequivocally demonstrated the plaintiffs had authority to be on the property).

Plaintiff's suggestion that a discrepancy in the color of the truck, the absence of keys, and the basis for the officers' conclusions as to why the hood was warm and the truck was damaged would require the Court to engage "in an excessively technical dissection of the factors supporting probable cause." Wesby, 138 S. Ct at 588. "The totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis." Id. (internal quotations omitted). The question now is not whether Plaintiff was guilty or innocent but whether the Investigating Officers had arguable probable cause to believe Plaintiff had committed a crime, considering all the facts and circumstances. The evidence demonstrates they did. To the extent the Investigating Officers were incorrect, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (internal quotation marks omitted). See also Wood, 323 F.3d at 878.

Plaintiff further contends his arrest was unlawful under both the Fourth Amendment and Florida law. See Response to Hepler Motion at 8-9. First, he asserts Mr. Evans's identification of him was

highly suggestive because it was conducted as a "show-up"[16] rather than a traditional "line-up." A show-up while "inherently suggestive," is not unconstitutional per se. See United States v. Winfrey, 403 F. App'x 432, 435 (11th Cir. 2010); see also Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987). In analyzing whether a show-up is "nonetheless reliable" even if unnecessarily suggestive, courts consider the length of time between the incident and the identification, and the witness's opportunity to view the suspect, degree of attention, level of certainty, and accuracy of the prior physical description of the suspect. Johnson, 817 F.2d at 729; Winfrey, 403 F. App'x at 435. A show-up is not unnecessarily suggestive unless police officers "aggravate the suggestiveness of the confrontation." Johnson, 817 F.2d at 729; Winfrey, 403 F. App'x at 435.

Officers do not aggravate the suggestiveness of a show-up simply because it is conducted while the suspect is in the presence of law enforcement officers or even detained. See Johnson, 817 F.2d at 729; Winfrey, 403 F. App'x at 435. In Johnson, the Court held a witness's identification reliable even though the witness identified the suspects after they had already been apprehended and were sitting in the back of a police car. 817 F.2d at 729. The

---

[16] A "show-up" is defined as, "[s]howing suspects singly to persons for the purposes of identification." United States v. Winfrey, 403 F. App'x 432, 435 (11th Cir. 2010).

identification was reliable because the witness identified the suspects minutes after the crime, observed the suspects in the daylight, thoroughly described them to the police, and was confident in his identification at the time. Id. See also Winfrey, 403 F. App'x at 436 (finding no evidence the officers aggravated the identification even though the witness observed officers escort the suspect out of a patrol car where the witness testified he was positive the suspect was the man who robbed him, the identification occurred twenty minutes after the robbery, and the witness was attentive during the commission of the crime); United States v. Walker, 201 F. App'x 737, 739, 741 (11th Cir. 2006) (holding a show-up was not unnecessarily suggestive where a robbery victim, shortly after the robbery occurred, identified the suspects who were handcuffed behind their backs, with the cuffs not visible, surrounded by officers, and standing in front of a marked patrol car).

Here, the relevant factors demonstrate Mr. Evans's identification of Plaintiff was reliable even though Plaintiff was handcuffed and standing near two police officers. Defendant Benton testified Mr. Evans did not hesitate or express uncertainty when he identified Plaintiff, suggesting Mr. Evans was confident in his identification. See Suppression Hr'g Tr. at 20. And, the identification took place shortly after the incident occurred; Defendant Benton testified "roughly 15 minutes" elapsed between

the time of the incident to the time he brought Mr. Evans to Plaintiff's residence. Id. at 18. Moreover, Mr. Evans, as the victim of the hit-and-run, had an opportunity to observe the events as they occurred. Mr. Evans described to Defendant Benton the following description of the accident:

> Mr. Evans advised that a Ford pickup truck . . . was backing out of a parking space. As he backed out and attempted to drive off, it struck the vehicle that was in front of it, backed up again, attempted to go around that vehicle and was unable to do so. . . . [T]he vehicle then backed up again striking Mr. Evans, and Mr. Evans advised that he was aware that the vehicle was also going to strike another pedestrian in a wheelchair, so at that time he started banging on the tailgate. The vehicle then left the scene.

Id. at 14. See also Benton Affidavit ¶ 4. After the truck hit Mr. Evans, he took a picture of the truck using his cell phone. See Suppression Hr'g Tr. at 15. Mr. Evans described the driver of the truck as "an older white male, . . . [who] was tall, . . . had gray hair and a mustache." Id.[17] Mr. Evans's detailed description of Plaintiff's driving, coupled with the fact that he was hit by the truck and had time to take a picture, suggests he was attentive

---

[17] The record evidence includes no physical description of Plaintiff. However, Plaintiff does not dispute the description provided by Mr. Evans is consistent with his appearance at the time. There is a discrepancy in the record as to whether Mr. Evans described the driver as "an older white male" or provided more detail, such as the color of his hair and that he had a mustache. See Suppression Hr'g Tr. at 25, 32. Considering the relevant factors in their totality, the discrepancy in the physical description is not enough to conclude the show-up was unnecessarily suggestive.

at the time of the incident. Considering the above, the relevant factors demonstrate the show-up was not unreliable. Moreover, there is no evidence to suggest the Investigating Officers "aggravated the suggestiveness" of the identification. Indeed, Defendant Benton testified he did not "do or say anything to try and suggest to Mr. Evans who the suspect was." Id. at 20

Plaintiff argues he was arrested under the authority of an illegal policy (the MAA), and the Investigating Officers violated the terms of the MAA. Even if these allegations are true, Plaintiff has not demonstrated a violation of federal law. Federal law, not state law, determines the validity of an arrest when a plaintiff challenges the arrest under the Fourth Amendment. Knight, 300 F.3d at 1276. A plaintiff's assertion that his arrest was made in violation of state law does not result in a Fourth Amendment violation to sustain a claim under § 1983. Id. ("There is no federal right not to be arrested in violation of state law.").

Moreover, it is undisputed the Officers believed the MAA was in effect and valid on the day they arrested Plaintiff outside the city limits of Fernandina Beach. See McDaniel v. Sheriff of Palm Bch. Cty., Fla., 491 F. App'x 981, 984 (11th Cir. 2012) (affirming summary judgment in favor of officers who arrested plaintiff under a mutual aid agreement plaintiff argued was invalid because the record indisputably showed the officers believed they were acting under a valid mutual aid agreement and they had probable cause).

Defendant Benton testified he believed the MAA authorized the FBPD officers to travel outside their jurisdiction to arrest Plaintiff under the circumstances:

> Q: At the time of this incident, was there a [MAA] in effect between the Sheriff's Office and Fernandina Beach that allowed you to leave the city limits to continue your investigation?
>
> A: There was, yes.
>
> Q: Did you review that [MAA] in advance of this hearing?
>
> A: I did.
>
> Q: Based on your knowledge of the agreement, are Fernandina Beach officers allowed to travel outside of the city to continue an ongoing investigation?
>
> A: Yes, they are.
>
> Q: Are they allowed to effect arrests outside of the city limits?
>
> A: Yes, they are.

Suppression Hr'g Tr. at 19. Plaintiff provides no evidence to contradict that the Investigating Officers believed the MAA was valid. The undisputed evidence shows the Investigating Officers acted under authority they believed they had.

Finally, Plaintiff argues his warrantless arrest violated the Fourth Amendment because he was arrested at his home, which he says was not a public place. Plaintiff's argument is not supported by the law. See Responses at 8. While a warrantless arrest inside someone's home is presumptively unreasonable, the same is not true

for an arrest that occurs just outside the person's home, or even in the doorway. Knight, 300 F.3d at 1277 (citing Payton v. N.Y., 445 U.S. 573, 590 (1980)). Plaintiff himself states quite clearly he was arrested after he stepped outside of his home, which he did willingly. See Plaintiff Affidavit at 1. Although Plaintiff states Defendant Hepler "ordered" him to step outside, id., Fourth Amendment jurisprudence "does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant." Knight, 300 F.3d at 1277 (citing cases).

For the above reasons, the Court finds the Investigating Officers had at least arguable probable cause to arrest Plaintiff on December 23, 2014. The Investigating Officers have carried their burden to demonstrate they were acting within their discretionary authority when they arrested Plaintiff, and Plaintiff has failed to carry his burden to show the Investigating Officers violated a constitutional right. Thus, the Investigating Officers are entitled to qualified immunity with respect to the arrest.

To the extent Plaintiff also disputes probable cause to seize his truck, the uncontroverted evidence is that the Investigating Officers, while conducting their lawful investigation, discovered Plaintiff was a "habitual traffic offender," requiring the impound of his truck. See Hepler Affidavit ¶ 8; Douglass Affidavit ¶ 8. Defendant Hepler testified at the Dismissal Hearing that the

Officers "ran" the license plate and discovered "the tag itself had a notation from the State of Florida to seize and impound the vehicle." See Dismissal Hr'g Tr. at 33. The impound report states the reason for the removal of the truck as, "state put hold on vehicle." Compl. Ex. A at 4. The Investigating Officers, therefore, had at least arguable probable cause to seize the truck. See McKnight v. State, 972 So. 2d 247, 253 (Fla. 1st DCA 2007) (recognizing officers properly arrested a suspect and seized his vehicle because, upon checking the status of the suspect's license, the officers discovered he was a habitual traffic offender). Even assuming the Investigating Officers wrongfully ordered the truck's seizure under Florida law, their conduct amounts to negligence under state law and not a Fourth Amendment violation. See Knight, 300 F.3d at 1277.

The Investigating Officers did not violate Plaintiff's constitutional rights as a matter of law when they arrested him for his suspected involvement in misdemeanor or felony hit-and-run, DWLSR, and reckless driving, and seized his truck. Accordingly, they are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claims for unlawful arrest.

## B. Due Process

Plaintiff asserts claims against the Officers under the Sixth and Fourteenth Amendments for "willfully suppressing and omitting exculpatory" evidence—Ms. Nelms's testimony and his truck. See

Complaint at 8-9. As a preliminary matter, the Court notes Plaintiff's claims related to the suppression or destruction of exculpatory evidence are properly analyzed under the protections of the Fourteenth Amendment due process clause, not under the Sixth Amendment right to "compulsory process." The Sixth Amendment right to compulsory process is a trial right. See, e.g., United States v. Garmany, 762 F.2d 929, 933–34 (11th Cir. 1985) ("To effectively implement this constitutional guarantee [to compulsory process], the accused has the right to subpoena witnesses on his or her own behalf to testify at a trial"). See also Penn. v. Ritchie, 480 U.S. 39, 56 (1987) (examining the contours of the Sixth Amendment right to compulsory process and noting that the Supreme Court has "never squarely held that the Compulsory Process Clause guarantees the right to . . . require the government to produce exculpatory evidence"). Plaintiff was not tried on the claims for which he was arrested. See Complaint at 7. Accordingly, his due process claims are to be analyzed under the Fourteenth Amendment.

Plaintiff's claims of a destruction or suppression of exculpatory evidence implicate the protections of Brady v. Maryland, 373 U.S. 83, 87 (1963). In Brady, the Supreme Court held the prosecution's suppression of favorable, or exculpatory, material evidence results in a due process violation, "irrespective of the good faith or bad faith of the prosecution." Id. While a Brady objection typically arises in the criminal context, with relief constituting a new trial, the Eleventh Circuit

has recognized that "[section] 1983 provides a cause of action for a violation of the due process right to a fair trial that is protected by Brady." Porter v. White, 483 F.3d 1294, 1304 (11th Cir. 2007) (citing McMillian v. Johnson, 88 F.3d 1554, 1569 (11th Cir. 1996)).

However, when the loss of liberty is attributable to a state actor's negligent conduct, the due process clause provides no protection. Id. (citing Daniels v. Williams, 474 U.S. 327, 328 (1986)). Accordingly, the Brady no-fault standard does not apply in the context of a § 1983 civil rights action for damages against an officer who allegedly withholds (or destroys) exculpatory evidence. See id. at 1306. Instead, a plaintiff suing for damages under § 1983 for a Brady-type violation must demonstrate more than mere negligence on the part of the officer. Id. at 1308. Moreover, the plaintiff must demonstrate the failure to turn over Brady material to the prosecution "causes [him] to be convicted at a trial." Id.

In Porter, the Eleventh Circuit held the plaintiff failed to demonstrate a genuine issue of material fact on his due process claim because the evidence demonstrated the defendant, at most, only negligently failed to turn over to the prosecutor at least one police report that was favorable to the plaintiff. Id. at 1311. In so holding, the Court articulated the following rule:

On the authority of <u>Daniels</u>[18] and <u>Cannon</u>,[19] we hold
that mere negligence or inadvertence on the part of a
law enforcement official in failing to turn over <u>Brady</u>
material to the prosecution, which in turn causes a
defendant to be convicted at a trial that does not meet
the fairness requirements imposed by the Due Process
Clause, does not amount to a "deprivation" in the
constitutional sense. Thus, a negligent act or omission
cannot provide a basis for liability in a § 1983 action
seeking compensation for loss of liberty occasioned by
a <u>Brady</u> violation.

<u>Id.</u> at 1308.

Plaintiff here fails to demonstrate a due process violation

against the Officers. Notably, the evidence Plaintiff claims to

have been "suppressed" from him was not. Plaintiff acknowledges he

saw Defendants Hepler and Douglass interview Ms. Nelms, and

Defendants Hepler and Douglass allegedly told Plaintiff what Ms.

Nelms told them. <u>See</u> Plaintiff Affidavit at 3. And, Ms. Nelms's

deposition eventually was taken. Moreover, no one withheld from

Plaintiff the nature and extent of damage to his truck. In fact,

he testified that he and Defendant Hepler walked around the truck

on the day of the arrest to assess the damage. <u>See</u> Dismissal Hr'g

Tr. at 17-18.

---

[18] <u>Daniels v. Williams</u>, 474 U.S. 327, 335-36 (1986) (holding the
due process clause is not implicated by the "tort[-]law concept"
of negligence).

[19] <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) ("As we held in
<u>Daniels</u>, the protections of the Due Process Clause, whether
procedural or substantive, are just not triggered by lack of due
care.").

With respect to the truck, while arguably helpful, it was not materially exculpatory and, thus, does not qualify as Brady evidence. Plaintiff could have presented the evidence of minor damage to his truck without having had physical possession of it. The impound report of Sky Towing noted minor damage to Plaintiff's truck on the day FBPD seized it: "various scuff marks [and] dent in driver front fender." Compl. Ex. A at 4. And, the photo of the truck, taken on the day of the accident, shows no visible damage to the rear. See Truck Photo at 1. In fact, the Nassau County trial judge concluded the truck was not "materially exculpatory" but only "potentially useful" because of the other evidence showing the truck was involved in an accident, who the driver was, and the extent of damage to the truck. See Dismissal Hr'g Tr. at 45-46.

Even if the evidence were materially exculpatory and indeed suppressed from Plaintiff, Plaintiff was not convicted at trial. Indeed, the charges against him were dismissed, as he plainly acknowledges. See Complaint at 7. Thus, Plaintiff is unable to establish an important element of his due process claim: a conviction. See Porter, 483 F.3d at 1308; see also Flores v. Satz, 137 F.3d 1275, 1278 (11th Cir. 1998) (holding defendants were entitled to qualified immunity because plaintiff did not demonstrate a Brady-type due process violation where he "was never convicted and, therefore, did not suffer the effects of an unfair trial").

Finally, even assuming Plaintiff could demonstrate materially exculpatory evidence was withheld, resulting in an unfair trial, he has offered no evidence of anything more than mere negligence by Defendant Evatt with respect to the truck's disposal. Defendant Hepler testified at the Dismissal Hearing the truck was released to a tow company in compliance with FBPD policy and not for the purpose of withholding or destroying potentially favorable evidence. See Dismissal Hr'g Tr. at 28. Plaintiff offers no evidence to suggest otherwise.

Rather, Plaintiff impermissibly asks the Court to stack inferences to conclude Defendant Evatt released the truck in bad faith. For instance, Plaintiff argues Defendant Evatt did not timely notify him of the manner and fact of the truck's release. At the Dismissal Hearing, Plaintiff testified he refused to sign for receipt of a letter Defendant Evatt hand-delivered to him in jail because the letter was undated, making "it appear that it was being give[n] to [him] in February, but it was actually March." Id. at 17. He also provides the affidavit of an officer with the NCSO,[20] who confirms Defendant Evatt delivered to him an undated letter in March. See Rowe Affidavit at 1.

The inferences and speculation required to conclude a hand-delivered, undated letter demonstrates bad faith on Defendant Evatt's part is not enough to permit a reasonable jury to find

---

[20] See (Docs. 65-3, 66-3, 67-3, 68-3, 69-3; Rowe Affidavit).

Defendant Evatt engaged in anything more than negligence with respect to his obligation to timely notify Plaintiff of the truck's disposal. At most, the evidence shows Defendant Evatt, through oversight, failed to notify Plaintiff of the release of the truck on or near the date he released it to the tow company.

Plaintiff also suggests Defendant Evatt did not notify the title company (TitleMax) that he released the truck to a tow company, contrary to Defendant Evatt's representation. See Plaintiff's Affidavit at 4. A review of a letter Plaintiff received from TitleMax[21] does not in fact contradict Defendant Evatt's representation. See Evatt Affidavit ¶ 13; TitleMax Letter at 2. The TitleMax litigation paralegal informed Plaintiff "TitleMax did not recover [the] [v]ehicle after it was seized." TitleMax Letter at 2 (emphasis added). The paralegal did not say TitleMax was not informed of the release of the truck to the tow company. See id.

Plaintiff appears to assert a property-deprivation due process claim against Defendant Evatt as well. See Complaint at 6, 9. The wrongful retention of personal property does not amount to a due process violation "if a meaningful postdeprivation remedy for the loss is available." Lindsey v. Storey, 936 F.2d 554, 561 (11th Cir. 1991) (quoting Hudson v. Palmer, 468 U.S. 517, 533 (1984)). In Lindsey, the court affirmed the entry of summary judgment in favor of the defendant who admittedly retained plaintiff's car after it was properly seized in connection with

---

[21] See (Docs. 65-5, 66-5, 67-5, 68-5, 69-5; TitleMax Letter).

criminal activity. 936 F.2d at 557, 561. The plaintiff asserted a due process violation under § 1983, arguing she was deprived of a post-deprivation remedy because the defendant did not institute forfeiture proceedings during the nine-month period her car had been detained. Id. at 561.

The Court rejected the plaintiff's argument, stating the Supreme Court "made clear that as long as some adequate postdeprivation remedy is available, no due process violation has occurred." Id. (emphasis in original). Because the plaintiff could have pursued a civil action for conversion under Georgia law, she had access to an adequate post-deprivation remedy. Accordingly, there was no due process violation "whether or not defendant … ever initiated forfeiture proceedings on the automobile." Id.

Like Georgia, Florida provides a statutory remedy for theft. See Fla. Stat. § 772.11(1). See also Case v. Eslinger, 555 F.3d 1317, 1331 (11th Cir. 2009) (recognizing Florida's civil cause of action for conversion provides an adequate post-deprivation remedy when law enforcement officers seize or retain personal property). Because Florida law provides an adequate post-deprivation remedy for the alleged wrongful retention of Plaintiff's truck, his due process property-deprivation claim against Defendant Evatt fails. Plaintiff's argument that Defendant Evatt chose not to pursue forfeiture proceedings under the FCFA does not save his claim. The Eleventh Circuit rejected the same argument advanced by the plaintiff in Lindsey. Because the plaintiff in Lindsey could have

pursued a state claim for conversion, the fact that the defendant officer failed to institute forfeiture proceedings was irrelevant. 936 F.2d at 561.

For the above reasons, Plaintiff has failed to demonstrate the disposal of his truck or the alleged "suppression" of Ms. Nelms's statements supports a due process violation under § 1983. Thus, the Officers are entitled to qualified immunity. Because the Court finds Plaintiff has failed to carry his burden to demonstrate a constitutional violation, the Court need not proceed to the next step of the qualified-immunity analysis—determining if a constitutional right was clearly established. Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Case, 555 F.3d at 1327 (quoting Saucier v. Katz, 533 U.S. 194 (2001)). Accordingly, the Officers' motions are due to be granted.

## IX. Claims Against the City

Plaintiff sues the City for two alleged unlawful policies. First, Plaintiff claims the warrantless arrest of him at his home, which is located outside the jurisdictional limits of the FBPD, violated the MAA. See Complaint at 3-4, 9; City Response at 9-10; Second, Plaintiff asserts "that it was common policy for FBPD … to

40

seize personal property under the guise of 'the [FCFA],' and sell

the seized property back to it's [sic] owner." Complaint at 7.

As to first alleged unlawful policy (the MAA), Plaintiff

alleges the following in his Complaint:

> [T]he City of Fernandina Beach and the Nassau
> County Sheriff's Office do not have the
> legislative authority to enter into an
> agreement that confers upon FBPD officers,
> jurisdictional police powers, coextensive
> with those of the county deputies with NCSO …
> [Plaintiff's] arrest, made pursuant to the
> [MAA] between NCSO and FBPD, without FBPD
> requesting assistance from NCSO, is contrary
> to Florida law … in violation of [his] Fourth
> and Fourteenth Amendment right to protection
> against unreasonable search and seizure and
> his right to due process.

Id. at 9. Plaintiff further argues the intent of the MAA is to

deal with "disasters, emergencies, and other major law enforcement

problems," which, he claims, the hit-and-run accident was not. Id.

The MAA (Doc. 54-2; MAA) provides the NCSO and FBPD are

permitted, by Florida Statutes and the agreement, to "receive and

extend mutual aid in the form of law enforcement services and

resources to adequately respond to . . . emergencies . . . and

continuing multi-jurisdictional routine law enforcement." MAA at

1. The agreement addresses "routine law enforcement" across

jurisdictional lines:

> In the event an officer of FBPD who is
> investigating a felony or a misdemeanor which
> occurred within FBPD jurisdiction should
> develop probable cause to arrest a suspect for
> that [crime] when the suspect is located
> outside the FBPD officer's jurisdiction but

> within Nassau County, the FBPD officer shall
> be empowered with the same authority to arrest
> said suspect as the FBPD officer would have
> within the political subdivision in which he
> or she is employed. An FBPD officer intending
> to effect a probable cause arrest pursuant to
> this paragraph should, whenever possible,
> request the assistance of the NCSO or other
> Law Enforcement Agency having jurisdiction
> within the area in which the arrest is to take
> place. Failure to request such assistance
> shall not, however, affect the validity or
> legality of any arrest made pursuant to this
> paragraph.

Id. at 3-4. It is undisputed the Investigating Officers arrested Plaintiff outside their jurisdiction for a crime that occurred inside their jurisdiction, and the Officers did not request the assistance of the NCSO.[22] See Suppression Hr'g Tr. at 18-19, 27.

The applicable MAA provision here permits an officer of the FBPD to arrest a suspect outside of his jurisdiction if the crime "occurred within FBPD jurisdiction," and the officer "develop[ed] probable cause to arrest [the] suspect for that [crime] when the suspect is located outside the FBPD officer's jurisdiction." MAA at 8. By its terms, the MAA permitted FBPD officers to arrest

---

[22] Defendant Benton conceded that, in arresting Plaintiff under the authority of the MAA, he did not contact the NCSO. See Suppression Hr'g Tr. at 27. The MAA provides, however, that failing to contact the NCSO shall not affect the validity of the arrest. Moreover, assuming Defendant Benton or the other Officers violated the terms of the MAA, the City is not liable. See Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 691, 693-94 (1978). See also Sevostiyanova v. Cobb Cty. Of Ga., 484 F. App'x 355, 360 (11th Cir. 2012) ("[T]he fact that the plaintiff suffered a deprivation of federal rights at the hands of a municipal employee is insufficient to establish a municipality's liability.").

Plaintiff because the crime occurred within their jurisdiction and they developed probable cause to arrest him when he was physically located outside the FBPD jurisdiction.

Contrary to Plaintiff's assertion, the MAA does not unlawfully give FBPD powers coextensive with the NCSO, nor does it apply only in emergency law enforcement situations. The MAA itself provides, "[i]t is understood by all parties that the purpose of [the] agreement is not to extend the territorial jurisdiction[] of FBPD unconditionally or without limits, but to expressly provide for interagency combined operational assistance and voluntary cooperation upon request." Id. at 2-3. One example of "voluntary cooperation" is the "investigation of any . . . violations of the Florida Uniform Traffic Control Law arising from within the jurisdiction of the FBPD," in which case the FBPD is permitted to take "appropriate action, including . . . arrest." Id. at 1-2.

The MAA, thus, properly limits the circumstances under which FBPD officers may cross jurisdictional lines and authorizes FBPD officers to effectuate an arrest for a crime that occurs within their jurisdiction and for which they have probable cause. The Investigating Officers here acted within the authority granted by the MAA.[23] See Ball v. City of Coral Gables, 548 F. Supp. 2d 1364,

_____

[23] Even assuming the MAA, as written or as applied to Plaintiff, is invalid, a violation of state law does not equate to a federal action under § 1983. See Knight, 300 F.3d at 1276.

1372 (S.D. Fla.), <u>aff'd</u>, 301 F. App'x 865 (11th Cir. 2008) (finding without merit Plaintiff's argument that a mutual aid agreement "exceed[ed] the authority of the enabling statute" because one purpose of the agreement was to provide "assistance of a routine law enforcement nature across jurisdictional lines").

With respect to the second alleged City policy, Plaintiff contends Defendant Hepler admitted under oath "it was the policy of [FBPD] to seize property under the [FCFA] and then sell it back to it's [sic] owner." <u>See</u> Complaint at 7; Response to City Motion at 11. Importantly, the only evidence Plaintiff points to of an alleged unlawful City policy is Defendant Hepler's testimony at the Dismissal Hearing:

> Q:  Is it the policy of the [FBPD], if there is a lien [on a seized vehicle], to return that vehicle to some other person?
>
> A:  It is. What typically happens is, if it has a lien on the vehicle, it depends on how much the lien is, whether the Department wants to assume that and pay it and keep the vehicle. Sometimes we offer to sell the vehicle back to the registered owner, or sometimes we just – we'll just <u>stop the seizure process and – as we did in this case</u>, and call a tow company to take possession of the vehicle so they can store it, since it was not going to be a police seizure, and we notify the owner of the vehicle.
>
> *   *   *
>
> Q:  Is it your testimony today that the vehicle was released in accordance with the [FBPD] policy?
>
> A:  Yes, it was.

Dismissal Hr'g Tr. at 27-28 (emphasis added). Even if Defendant Hepler's testimony fairly can be interpreted as describing an unlawful City policy, Plaintiff's truck was not released by FBPD in accordance with the challenged policy. See id.; Compl. Ex. I at 2-3; Evatt Affidavit ¶¶ 10, 12, 13. Thus, he was not affected by the policy he alleges is unlawful. See, e.g., Cuesta v. Sch. Bd. of Miami-Dade Cty., Fla., 285 F.3d 962, 966 (11th Cir. 2002) (ruling that a plaintiff can establish governmental liability under § 1983 only by demonstrating the official policy was the "moving force" behind a constitutional violation).

Moreover, to the extent such a policy exists and was enforced here, Plaintiff has presented no evidence as to the "settled" nature of the alleged policy such that a jury could reasonably conclude it was a "widespread practice." See id. at 967 ("A plaintiff can establish § 1983 liability by identifying that []he has been deprived of constitutional rights by either an express policy or a 'widespread practice that . . . is so permanent and well settled as to constitute a custom and usage with the force of law.'").

The City has carried its burden to demonstrate there are no genuine issues of material fact with respect to Plaintiff's claims against it. There is no evidence upon which a reasonable jury could find the City implemented, adopted, or ratified a policy or custom

that resulted in the violation of Plaintiff's constitutional rights. Thus, the City Motion is due to be granted.

Accordingly, it is now

**ORDERED:**

1.    Plaintiff's Motion to Compel Response to Non-Party Subpoena (Doc. 61) is **DENIED.**

2.    Plaintiff's Motion for Extension of Time (Doc. 63) is **DENIED as moot.**

3.    Plaintiff's Request for Judicial Notice (Doc. 64) is **GRANTED.**

4.    Defendant City of Fernandina Beach's Motion for Summary Judgment (Doc. 54) is **GRANTED.**

5.    Defendant Evatt's Motion for Summary Judgment (Doc. 55) is **GRANTED.**

6.    Defendant Benton's Motion for Summary Judgment (Doc. 56) is **GRANTED.**

7.    Defendant Douglass's Motion for Summary Judgment (Doc. 57) is **GRANTED.**

8.    Defendant Hepler's Motion for Summary Judgment (Doc. 58) is **GRANTED.**

9.    The **Clerk** is directed to enter judgment in favor of Defendants, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of March, 2019.

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Dennis Hutto
Counsel of Record